The State v. Kennedy.

---

## THE STATE *v.* SAMUEL KENNEDY.

A new trial will not be granted, in a prosecution for murder, on the ground of the jury having been permitted to communicate with persons not members of their body, where they were kept together in apartments provided for their use during the adjournment of the court, and the few words exchanged by the jurors with persons not of their body, were with sworn officers of the court, brought unavoidably in contact with them, and did not relate to the trial, nor were of a character to produce the slightest effect upon their decision.

Where a jury in a criminal·case is put in charge of a sheriff or his deputy, it is not necessary that either should be specially sworn to keep them together, and not to speak to them except to ask them if they are agreed, nor to permit others to speak to them. The duty of the sheriff, or his deputy, in such a case is an official one, which they having been already sworn to perform, no additional oath was necessary.

Where on a trial for murder, a person offered to be sworn as a juror answers on his *voir dire*, that he has conscientious scruples against finding a verdict of guilty in any case involving the life of the accused, he may, on the principles of the common law, independently of any statutory enactment, be set aside for cause.

Where twelve months have not elapsed between the time when a juror first determined to fix his residence in this State, and the date of the formation of the *venire*, he is incompetent, not having resided twelve months within the State, as required by law. The twelve months commence only from the date of the determination to reside within the State, though the party may have been within it for many months previously.

An objection to a juror on account of want of residence should be made when the juror is offered to be sworn. Where no inquiry is made of the juror on his *voir dire*, as to his residence, any objection on that account will be too late on a motion for a new trial. *Aliter*, when, on being interrogated, he states that he possesses any qualification, and the statement is afterwards found to be false.

In applications for a new trial in criminal cases, on the ground of newly discovered evidence, it must be shown that there has been reasonable diligence to procure the evidence, that it has been discovered since the trial and is material, and that it would probably produce a different verdict, if a new trial be granted.

The State v. Kennedy.

It is not necessary, either in England or in this State, to mention in an indictment the name of the court in which it was found; consequently, where the style of the court is inaccurately given in the commencement and statement of an indictment, it will be disregarded as surplusage.

The caption forms no part of an indictment. It is a separate act, not submitted to nor acted on by the grand jury, preferring no charge against the accused, and never appears on the record till the bill has been found, and generally not until the indictment has been removed for trial to a higher tribunal, by writ of error or *certiorari.* Its principal object is to show that the inferior tribunal had jurisdiction of the offence, and owes its origin to the peculiar organization of the English courts. In this State, where the same court before which an indictment is found must try it, no caption is necessary or required.

In an indictment the venue, that is, the parish in which the offence was committed, must be stated, in order that the court may know whether it has jurisdiction.

In indictments for offences termed felonies at common law, the time when the offence was committed must be stated with such certainty that no doubt can be entertained of the period really intended. Any uncertainty in the averment of time and place will vitiate the indictment. This averment must be repeated as to every issuable fact; when they have been once set forth with certainty, they may, in every subsequent averment, be referred to by the words *then* and *there,* which are equivalent to a repetition of the time and place.

In an indictment for murder, the material facts are the mortal stroke and consequent death, and the death must appear to have occurred within a year and a day after the mortal stroke. The averment of each of these material facts must be accompanied by an allegation of a certain time and place: thus, where an indictment for murder, after stating the mortal blow, with the usual averments of time and place, proceeds : " Of which mortal wound so given by the said K. with the deadly weapon aforesaid, to the said W., the said W. did then and there suffer and languish and languishing did live, and, a few hours after did die of the said mortal wound," the averment of the time and place of the death is insufficient ; and the defect is not cured by a verdict. *Per Curiam :* The words *" then* and *there"* immediately precede and refer to the words " languished and languishing did live," and not to the allegation " and a few hours after did die." The copulative *and* is insufficient to connect the time and place with the death. The facts of time and place must be precisely and distinctly stated ; they cannot be inferred. Nor will the averment in the conclusion of a correct time and place of death, cure this defect; on the contrary, it will render it repugnant to the statement.

The stat. of 4 May, 1845, s. 33, which provides that " the forms of indictments (divested, however, of unnecessary prolixity,) the method of trial, rules of evidence and all other proceedings whatsoever in the prosecution of said crimes, offences and misdemeanors, changing what ought to be changed, shall be, except as otherwise provided for, according to the common law," did not intend to confer upon the courts authority to legislate on the subject of criminal proceedings or the framing of indictments, but merely to direct prosecuting officers to omit those prolixities acknowledged to be such at common law, and unnecessary, though habitually inserted in indictments ; and the changes directed to be made, are those necessary to make our proceedings conform to our own laws and form of government. Whatever has been determined to be an essential averment in an indictment at common law will be deemed necessary here, unless a statute of the State has removed the reason, and with it the necessity for the allegation.

APPEAL from the Criminal Court of the First District, *Canonge,* J.

*Preston,* Attorney General, for the State.

*R. Hunt,* and *Grymes,* for the appellants.

The opinion of a majority of the court was pronounced by

KING, J.  The defendant Kennedy, was indicted before the Criminal Court of the First District for the murder of Benjamin Wood Wait, alleged to have been committed in the parish of New Orleans.  Upon trial he was convicted, and having in the court below made ineffectual motions for a new trial and in arrest of judgment, he has sought relief by an appeal to this court.

The conclusion at which we have arrived, would warrant us in passing in silence over most of the grounds relied upon by the appellant in support of his motions.  Pursuing, however, the practice which we hitherto observed, of disposing of all the questions submitted to our consideration in each case, we will proceed to examine those presented upon this appeal.

The first ground upon which the defendant asks for a new trial is, that after the jurors were empannelled and sworn to try the cause, they were permitted to have free communication with other persons than the sheriff's officer.

The facts in relation to this alleged irregularity are, that at nine o'clock in the evening of the first day of the trial, it was found that the investigation could not be concluded at that sitting, and the court was adjourned until the following morning.  The jury were delivered to an officer, with instructions not to speak to them himself, nor to permit others to speak to them concerning the matter then under examination.  The judge also advised the jury to abstain from conversations among themselves about the case, as the evidence had been only partially heard, and their opinions should be held suspended until the whole testimony came before them.  The jury spent the night in the court room, and clerk's office, adjoining apartment in the same building, where refreshments were provided for them.  The clerk and his deputy were compelled to remain in these rooms after the adjournment, in order to make up the record of the day's proceedings, there being no other apartment to which they could repair for that purpose, and obtained a special permission from the judge to that effect.  The clerk, when about to depart, said to one of the jurors "There take my cloak," and left the room saying nothing more.

Mr. Clement Blaney, the deputy clerk, left his office, and passed through the court room at the moment that the jury were supping, and, was invited by several of them to join in their meal. He declined the invitation, but took a glass of wine, spoke a few moments with the sheriff, and withdrew without saying a word about the matter then pending before the jury.  Fabre, the officer of the court into whose charge the jury were delivered, and Labutut a deputy, who was present to assist him in the discharge of his duties, supped with the jury but neither spoke to them themselves, nor permitted others to speak to them in relation to the

trial. These are the facts which constitute the alleged fatal irregularity.

We said in the case of *The State* v. *Hornsby*, decided at a former term of this court, *ante*, 554, that, in capital cases, when the jury were permitted to separate during the progress of the trial, misconduct would be presumed ; and this upon the ground, that in promiscuous intercourse with their fellow citizens, their minds were necessarily exposed to be influenced, and to receive impressions of which they themselves might perhaps not at the time be conscious ; and that it would be impossible to establish the fact by evidence. But this presumption does not arise where the jurors have been kept together. The reason of the rule then ceases. Measures are thus taken to prevent misconduct, and the means provided for ascertaining, and for establishing by proof, the precise nature and character of their irregularities, from which courts may determine whether the tendency of the acts has been to influence the verdict.

Every irregularity will not vitiate a verdict, but those only which are calculated to produce an impression upon the minds of jurors, and influence the verdict which they are to render, (2 Summer, 83 ;) and courts will satisfy themselves that such has been the tendency of the acts complained of, before new trials will be granted on the ground of misconduct on the part of the jury.

In the present instance, the few words exchanged by the jurors with persons not of their body have been detailed. The conversations were held with some officers of the court, brought unavoidably in contact with them, did not relate to the trial, and were not of a character to produce the slightest effect upon the decision of the jury.

The next ground urged is, that the bailiff into whose charge the jury was delivered was not sworn, " to keep them together and to permit none to speak to them, nor to speak to them himself, but only to ask them, whether they are agreed."

Hale says, that when the jurors depart from the bar, a bailiff ought to be sworn to keep them together, and not to suffer any to speak with them. 2 Hale, 396. This formality appears to be observed at all common law trials, and the books which treat of those proceedings generally concur in stating, that the oath ought to be administered, but do not assert that it is essential to the validity of a verdict; nor have we been referred to any adjudicated case where the omission was held to be fatal.

The sheriff and his deputies, before entering upon the duties of their offices, are required, by our constitution and laws, to take an oath, faithfully and impartially to perform the duties incumbent

upon them. The duties of keeping the jury together, in such cases, and of not permitting them to speak with any one, is one of those imposed by law upon these officers, when juries are delivered into their charge, and of course are of those which they have already been sworn to perform. No additional oath would, therefore, seem to be necessary for the execution of this specific service, unless it might be to remind the officer of his duty. This was done by the judge, who gave special instructions to the deputy sheriff, into whose charge the jury was delivered, as to the nature of his duties ; and the latter appears to have executed them as strictly as though the oath contended for had been administered. The object in view was to prevent misconduct on the part of the jury, and this was attained.

By our laws, this form has been dispensed with in civil proceedings, and the practice in criminal prosecutions appears generally to have fallen into disuse in this State. It may be doubted whether our courts have the right to exact such an oath from a bailiff. The act of 1815, after prescribing the form of the oath to be administered to all officers in this State, in the sixth section provides : " that from and after the ,passing of this act, all other oaths of office shall be, and they are hereby, repealed." Bullard & Curry's Dig. 611. We do not think that the oath is necessary here.

The next cause assigned for a new trial is, that the judge erred in permitting two jurors to be challenged by the Attorney General for cause, because they were conscientiously opposed to capital punishment.

Two persons being called as jurors, and sworn upon their *voir dire*, were asked by the attorney general, " whether they had any conscientious and religious scruples against finding a verdict of guilty, in any case involving the life of the accused ?" The question was answered affirmatively, and the jurors set aside for cause.

It is contended, that no such ground of recusation is known to the common law, or to the statutes of this State, and that the decisions of courts in other States recognizing the validity of this objection to jurors have been based upon special legislative enactments.

Our statute merely declares the qualifications of condition, age, sanity, residence and property, which the citizen must possess before he can be drawn and summoned as a juror, leaving the court or triors, as the case may be, subsequently to determine, upon inquiry, when he is presented to the prisoner, whether his mind is free from anger, influence or prejudice.

" The rule of the common law is, that the juror must stand indifferent as he stands unsworn." Co. Litt. 155, *a.* He cannot

be said to stand indifferent between the State and the accused, upon a trial for a capital crime, when, from his religious belief and conscientious scruples he cannot convict, and is therefore previously determined to acquit. No adjudicated case upon this point is found in the common law reports, probably because opinions opposed to capital punishments do not prevail in England. But an English judge would not hesitate, in a capital case, to reject jurors professing such opinions, upon the common law principle, that they did not stand indifferent, that they were not above all exception, and those by whom the truth of the matter in controversy could be best ascertained. 1 Chitty, C. L. 544. Bacon's Abridgment, *Juries*, G. 5.

A similar question arose in New York, growing out of a statute relating to persons who belonged to religious denominations opposed to the infliction of capital punishment. Mr. Chief Justice Savage, speaking of a juror who entertained the same opinion, but was not a member of a religious denomination, said, "such a person is unfit; he has prejudged the question; he has made up his verdict without hearing the evidence, and ought to be excluded upon common law principles. It would be a solemn mockery to go through the forms of a trial with such a jury, or even with one such juror. The prisoner is sure to be acquitted independent of the question of guilt or innocence. It would be a misnomer to call such a proceeding a trial." 13 Wendell, 354, 355.

In the case of *The United States* v. *Cornell*, Mr. Justice Story in sustaining an objection made to a juror upon very similar grounds, says; " To compel a quaker to sit as a juror in such cases, is to compel him to decide against his conscience, or to commit a solemn perjury. Each of these alternatives is equally repugnant to common sense. To insist on a juror's sitting in a cause where he acknowledges himself to be under influences, no matter whether they arise from prejudices or from religious opinions, which will prevent him from giving a true verdict according to law and evidence, would be to subvert the objects of a trial by jury, and to bring into disgrace and contempt the proceedings of courts of justice. We do not sit here to procure the verdicts of partial and prejudiced men, but of men honest and indifferent in causes." 2 Mason's Rep. 105.

In Pennsylvania the question was similarly decided, exclusively upon common law principles; (17 Serjeant & Rawle, 155;) and upon those principles we think this objection to a juror a good one in this State.

The next position taken is, that one of the jurors had not resided in the State for twelve months previous to the formation of the *venire*. This person came to the city of New Orleans, on the 4th

of November, 1843. He was at that time a partner in a commercial house here, and remained here, engaged in business as a member of the firm, until the 17th June, 1844, when he returned to New York upon business, and to see his family, and was absent until the 23d September, 1844. When he first came, it was with the intention of establishing himself in mercantile business. Some three or four months after his arrival, he for the first time, made up his mind to bring his family to this city, and reside here permanently. His intention of fixing his residence in this State was, therefore, not formed until about the 4th March, 1844. The *venire* upon which he was summoned was formed about the end of February, 1845.

Our act requires a residence of twelve months previous to the formation of a *venire* as one of the qualifications of a juror. The juror had not acquired this residence, and therefore could not have been legally drawn or presented to the accused. 2 Robinson, 266. The want of residence is not an exception which the juror alone can plead, but a defect of which the accused may, at the proper time, avail himself. The law requires this term of residence in order that the juror may acquaint himself with the laws and institutions of the State, and incorporate and identify himself with its people, before he shall be permitted to sit in judgment upon their lives and property. The objection however comes too late. It should have been made when the juror was offered to the accused. 1 Chitty, 545, 546.

An opportunity is then afforded to the prisoner of inquiring into the qualifications of the juror upon the *voir dire* examination. If, upon that inquiry, he be found to want the legal qualification, he may be set aside for that cause. It would have been different if the juror, when interrogated, had stated that he had acquired the requisite residence, was free from bias, or that he possessed any other legal qualification, and it had subsequently been discovered that the statement was false. This would have been a fraud practiced upon the accused, from which he could have been relieved. Having waived the right accorded to him by law, he waived with it every objection which he might have urged to the juror. Lord Ellenborough said, that a different rule might vitiate one-half of the verdicts rendered at every assizes in England. The same remark is applicable here. 2 Bay's Rep. 155. Graham on New Trials. 1 Chitty, 545, 546, and the authorities there quoted.

The next ground relied upon is, that new and material evidence has been discovered since the trial. In applications for new trials upon this ground, it should not only be made to appear, that there has been reasonable diligence, that the evidence has been discovered since the trial, and is material, *but that it is*

*not cumulative, and would probably produce a different verdict if a new trial were granted.* This principle seems to be well settled.

In the cases of *The State* v. *Clark,* and of *The State* v. *Hornsby,* decided at former terms of this court, *ante,* pp. 533, 554, it was held, that " it is not sufficient to warrant the granting of a new trial, that the newly discovered evidence might have the effect of throwing a shade of doubt over some of the incidental circumstances of the trial. It should appear to be of so decided a character that, if admitted, it would give to it an acquitting complexion."

From such of the facts as can be gathered from the record, we are not prepared to say, that the new discovered evidence is such as ought to have produced a different result, if it had been submitted to the jury, even if the credibility of the new witnesses were entirely free from suspicion. The record discloses the additional fact, that the newly discovered witness has, on a former occasion, been convicted of forgery in this city, and that, at the time of making this application, he was confined in one of the prisons of this parish under a similar accusation preferred against him. We think the court properly refused the new trial.

We will now proceed to examine the several grounds upon which an arrest of judgment has been claimed.

The first of these is, that "the indictment does not correctly express the name of the court where the indictment was found, but erroneously styles it the *Criminal Court of the First Judicial District,* when the act of 1821 declares the court shall be known and called the *Criminal Court of the First District ;* that a court is only known and properly designated by the name and style prescribed by law ; that the name of the court where the presentment is made must be expressed ; and that an erroneous statement or description of the court, of its name, style, or title to authority is fatal."

The better to understand the nature of the alleged error it will be necessary to transcribe that part of the indictment in which it is supposed to occur. It is as follows ;—

" The State of Louisiana, Criminal Court of the First Judicial District, parish of New Orleans :

" The grand jurors of the State of Louisiana duly empannelled and sworn for the parishes of Jefferson, Orleans and Plaquemines, upon their oath present, that one Samuel Kennedy, late of the city of New Orleans, on the 29th day of December, in the year of our Lord one thousand eight hundred and forty-four, at the said city of New Orleans, in the parish of Orleans, and within the jurisdiction of the Criminal Court of the First Judicial District, did" &c.

It will be perceived that the alleged vices occur in the *commencement* and *statement* of the indictment.

It is manifest that the name of the court differs in the indictment from that given to it in the legislative act, which is "*Criminal Court for the First District.*" Bul. & Curry's Dig. 193.

Admitting for present purposes, that the variance is material, and would be fatal in a *caption*, we will proceed to inquire if it be necessary in this State, to describe in any part of an indictment the court in which it was found.

At common law, the only source to which we can refer for the principles upon which the decision of the question depends, the commencement of every indictment is thus : " Middlesex, to wit : The jurors of our Lord the King, upon their oath present, that" &c. and this is what is technically termed the commencement, after which follows the statement of the offence.

Indictments in England neither describe the court before which they are found, nor the jurors by whom they are found, nor do they aver that the court has jurisdiction of the offence.    The numerous authorities to which we have been referred in support of the position that the court is to be set forth in the *indictment*, all concur in stating, that it is to be described in the *caption* and with great precision, but none, that the description is ever given in the indictment itself.

Now the caption is not to be confounded with the *commencement*, nor with any other part of an *indictment*.    It forms no part of that instrument, but is a wholly separate and independent act, which is not submitted to, nor acted upon by the grand jury, prefers no charge against the accused, and never figures upon the record until after the bill has been found, and, in general, not until the indictment is removed for trial to a · higher tribunal, by a writ of error or of *certiorari.*

In England, when in obedience to one of these writs, an indictment is removed from an inferior to a superior court, it is accompanied by a history of the previous proceedings, describing the court before which it was found, the time and place where it was found, and the jurors by whom it was found.    This is properly the return to the writ, from which is extracted the caption which is prefixed to the indictment in the record.    Its principal object is to show, that the inferior tribunal had jurisdiction of the offence, and thence arises the necessity for the great precision required in that respect.    2 Hale, 165, 166.    Chitty's C. P. 326, 327, 328. Starkie, C. P. 258.    Archbold, C. P. 24.

Captions owe their origin to the peculiar organization of the English courts, some of which, with *limited* jurisdiction, and not unfrequently acting under *special commissions*, may take indictments.    These indictments may be removed to the Court

of King's Bench for trial. That court will require, before examining the charge, a history of the previous proceedings, and to be specially informed of the authority of the inferior court to take the indictment; for, if the inferior court transcend its authority, the whole proceedings will be null, and the indictment quashed.

There is nothing analogous to this in our judicial system. We have but one class of courts for the trial of criminal accusations preferred against free persons, viz. the Criminal Court of the First District, and the District Courts; upon these, exclusive and unlimited original jurisdiction has been conferred. Indictments can be found and tried only before them, and cannot be removed from one to another of them. When an indictment sets forth the parish or venue where the offence has been committed, the law fixes the only court which has jurisdiction of it. The same court before which the indictment was found must try it. Hence there is, in this changed condition of things, no necessity for a caption to the indictment in this State. The court which has itself taken the indictment cannot desire to be informed by what authority it was acting, nor can it desire a formal statement of proceedings, all of which have passed under its own eye, and form a part of its own records.

The error in the position assumed by the defendant has been, in insisting upon a correct averment in the indictment of a fact, which the strictness of common law proceedings only required to be stated in the caption, when a caption became necessary. We find that, at common law, the designation in an indictment of the court before which it was found, is not required. Under our system, the necessity for a caption can never arise; and it has, therefore, been in practice discarded. It follows as a consequence, that it is not necessary to make the averment in any part of our criminal proceedings. Those parts of the indictment under consideration, which are in the following words; "The Criminal Court of the First Judicial District," are surplusage, and, as such, may be rejected without injuring the remainder of the instrument.

It is necessary to state the venue, that is, the parish in which the offence was committed, that the court may know that it has jurisdiction. In the present instance, the venue has been distinctly expressed in the commencement; and, in the statement, the crime is alleged to have been committed in the parish of Orleans.

The next objection made to the indictment is, that " It is defective in its statement. The allegations of the time and place of the death of the person murdered are material, and must be distinctly set forth in the indictment. It must appear that the party

died within a year and a day. This indictment states neither time nor place of the death of the party killed, and is, therefore, fatal."

The indictment, after stating the mortal blow, with the usual averments of time and place, proceeds: " Of which mortal wound, so given by the said Samuel Kennedy, with the deadly weapon aforesaid, to the said Benjamin Wood Wait, the said Benjamin Wood Wait did then and there suffer and languish, and languishing did live, and a few hours after did die of the said mortal wound."

No principle appears to be better settled than that, in indictments for high offences, those termed felonies at common law, the averment of *time* and *place* is to be repeated to every issuable and triable fact. When these have been once set forth with certainty, they may, in every subsequent averment, be referred to by the words *then* and *there*, which are deemed equivalent to a repetition of the time and place. The time should be stated with such certainty, that no doubt can be entertained of the period really intended; and such is the precision required in this respect, that any uncertainty in the averment of time and place will vitiate the indictment.

The material facts in murder are the mortal stroke, and the consequent death, and the death must appear upon the record to have occurred within a year and day from the time when the mortal stroke was given. The averment, then, of each of these material facts must, under the well established rules of criminal pleading, be accompanied by an allegation of a certain time and place. Thus, to aver that the assault was made on two days, as on the first and second of May, or on an impossible day, is such an uncertainty as will vitiate the indictment.

If an indictment for murder state that A , at a given time and place, having a sword in his right hand, did strike B., it is bad, for the time and place relate to the having the sword, and it is not stated when or where the stroke was given.

A., at a certain time and place, made an assault upon B., *et eum cum gladio percussit*, was held to be bad, because it was not said *adtunc et ibidem percussit*. The copulative conjunction " *and*," without the repetition of the time and place to this material ingredient of the offence, being deemed insufficient. In misdemeanors the same strictness is not required. 1 Chitty, 218, 219. Starkie, Cr. Pl. 58, 62, 65. 2 Hale, 178. Archbold, Cr. Pl. 34. 2 Hawk. cap. 23, sec. 88.

We will not further multiply instances of this precision, required in the averment of time and place to every material fact in capital crimes. The books are full of them, and no principle is better settled. The decision of the question depends altogether

upon authority, and the language of the authors cited, upon this as upon other points, has been used as nearly as possible.

Testing the indictment under consideration by these well established rules we find, that although there is a sufficient certainty in setting forth the time and place of the mortal stroke, yet there is no averment of the time and place of the death. The *then* and *there* immediately precede and refer to the " languished, and languishing did live," and not to the allegation, " and a few hours after did die." The copulative *and*, it has been seen, is insufficient to connect the time and place with the death. Nor will the grammatical construction of the sentence support the position assumed in argument, that the *then* and *there* refer to the death. The facts of the time and place of death cannot be inferred or ascertained by intendment; they must be precisely and distinctly stated. Nor will the averment in the *conclusion* of a correct time and place of death, cure this defect, but, on the contrary, will render it repugnant to the statement. At the close of the indictment the legal conclusions are to be drawn from the facts previously set forth in the statement. The facts of the time and place of the death not having been set forth in the statement, the legal conclusion cannot be drawn, that the deceased was murdered in the parish of Orleans, on the 29th day of December, 1844.

The attorney general has called our attention to the statute of 1805, which directs that indictments, divested of all unnecessary prolixity, changing what ought to be changed, shall be according to the common law, and contends, that the frequent repetitions of time and place constitute some of the prolixities contemplated by the act, of which courts are authorized to divest indictments. We are not prepared to give this construction to the statute. We do not believe that the Legislature intended to confer upon courts authority to legislate upon the subject of criminal proceedings, or the framing of indictments, but merely to direct prosecuting officers to omit those prolixities which were acknowledged to be such at common law, and, consequently, unnecessary, although habitually inserted in indictments; such as the averment that the defendant " not having the fear of God before his eyes," &c., with many others needless to be enumerated, which are found in old precedents, and even in those of more modern date. The changes directed by the act, we think, are those which are necessary to make our proceedings conform to our own laws and form of government; as, for instance, instead of an indictment commencing; " Middlesex, to wit: The jurors of our Lord the King," it should begin; " The State of Louisiana, Parish of Orleans: The grand jurors of the State of Louisiana;" with many others of a like nature. If, however, this legislative authority

was ever conferred upon courts, it has long since been withdrawn by the constitution.

Whatever has been determined to be an essential averment in an indictment at common law, will be deemed necessary here, unless a statute of the State has removed the reason, and with it the necessity for the allegation. At common law, we have seen, that the averment, with certainty, of time and place of the death have been held to be indispensable in indictments for murder, and for sufficient reasons. These reasons have not been removed by our statutes, but exist here in full force; for it is equally true here, as in England, that the death must have occurred within a year and a day from the time when the blow was given, to constitute murder, and that the right to a trial by a jury of the *vicinage* is secured to every citizen.

We find, then, that the indictment wants one of the averments essential to its validity at common law, and that the averment is equally necessary under our laws. The defect is not cured by the verdict, and the judgment must be arrested.

The attorney general has commented forcibly upon the regrets expressed by learned and able English judges, that the great niceties required in framing indictments offered too frequent opportunities for the escape of culprits, the tendency of which was rather the encouragement, than the suppression of crime. Lord Hale said, that the strictness required had grown to be a blemish and an inconvenience in the law. Similar opinions have since been expressed by Lord Kenyon and Lord Ellenborough. 1 Chitty, 170. But we are not informed that these learned judges ever felt themselves authorized to disregard the law, such as it was, or to dispense with the observance of those niceties, of whose existence they complained. Their remarks apply with full force to the criminal laws of this State; that the power to remedy the evil resides in the legislative branch of the government, and it is to be regretted that it has not already been exercised.

The English parliament attentive to the suggestions of its courts, has provided remedies for many of the inconveniences of the common law. The act, however, has been passed since 1805, and has no force in this State. Archbold. Stat. Geo. IV.

It is therefore ordered, that the judgment of the inferior court be reversed; that the verdict in the case be set aside, and the judgment thereon arrested.

NICHOLLS, J. dissenting. Constrained to differ upon a single point from the opinion which has just been delivered, it is a source of satisfaction that my dissent, if erroneous, will exercise

no influence over the fate of the accused, and that a new trial will be awarded him, though a sense of duty compells me to withhold my concurrence. In all particulars I conceive, that the law has been properly expounded in the opinion of the court, except in sustaining the exception to the statement of the indictment respecting *time* and *place*, of which I believe the court has taken an improper view.

The indictment, or that part of it which is considered objectionable, is in the following words : " Of which mortal wound, so given by the said Samuel Kennedy, with the deadly weapon aforesaid, to the said Benjamin Wood Wait, the said Benjamin Wood Wait did then and there suffer and languish, and languishing did live, and, a few hours after, did die of the said mortal wound." This averment is deemed by the court defective, as not sufficiently descriptive of *time* and *place*. It is of opinion that the copulative *and* is insufficient to connect the *time* and *place* with the death, and that the grammatical construction of the sentence, will not support the position assumed in the argument that the *then* and *there*, refer to the death. Unable to subscribe to this position, I would observe, that there exists an ellipsis in the sentence, which should be confined grammatically no more to the absence of the words *then* and *there*, than to others equally important, and which the most fastidious hypercritic must admit as essential to convey the intended meaning, in that particular which the court considers sufficiently lucid to sustain the indictment. To insert all the words which are left out in this sentence so as to convey the meaning which the court thinks satisfactory, it should read : " Of which mortal wound so given by the said Samuel Kennedy, with the deadly weapon, aforesaid, to the said Benjamin Wood Wait, the said Benjamin Wood Wait then, and there did suffer and languish, and languishing *then and there he the said Benjamin Wood Wait did live, and* a few hours after *he the said Benjamin Wood Wait did then and there die*." Now all the words above which are italicised, are *under-derstood*, and necessarily understood, to make the sentence grammatically correct, but which to avoid tautology, the genius of the language has rejected, unless it be conceded that the whole sentence is connected together by the copulative *and*, whose power for this purpose, is palpably as clear in the one case as in the other. Take the same liberty with the sentence by inserting the words *then* and *there* as understood, with reference to the death as is necessary to show that the man who languished and died, was Benjamin Wood Wait, (which fact is not stated in the indictment unless the name is thus understood, and which is justified and required by the grammatical and proper construction,) and

the one averment is as distinctly made as the other; so distinctly made that, it is impossible to mistake the one or the other. But if any lingering doubt should still remain as to the *place* where he died, it is abundantly made manifest, by a subsequent part of the indictment viz.: "And so the grand jurors aforesaid, upon their oaths aforesaid, do say, that the said Samuel Kennedy, *on the day aforesaid, at the time and place aforesaid, and in the manner and form aforesaid, feloniously, wilfully and of his malice aforethought, did kill and murder,*" &c. Here it is averred (if any doubt remained,) that he murdered Wait at the *time* and *place*, aforesaid; the word *murder*, even when unaccompanied by the words *feloniously, wilfully* and of his malice aforesaid, comprising both the blow and the death; both must combine to comport with its meaning. Thus to me it appears to be clearly alleged that Wait received the *blow* and died *at the city of New Orleans, in the parish of Orleans, and on the 29th December*, 1844; as the only *time* or *place* mentioned in the indictment, are the city of New Orleans, parish of Orleans, the 29th December, 1844, and both stated as descriptive of the arena and epoch of this melancholy occurrence; the words, at the *time* and *place aforesaid,* refer to *this time* and *this place,* and to no other, as no other is mentioned. I find, therefore, nothing in the grammatical structure of the sentence, which would exclude my construction of the words; on the contrary much to confirm it.

The legal phasis which the words present, offers nothing to my mind, variant from true grammatical construction. To the decisions of the English judges and English courts, I have been taught to pay great respect and deference; in fact their intrinsic merit would extract homage from the most unwilling and prejudiced mind; but I can never forget, that the common law of *England* is not the common law of *Louisiana ;* that the Legislature, in adopting a code of laws for the prosecution of crimes, had declared (in the act of 1805,) that all the crimes, offences and misdemeanors therein named, shall be taken, intended and construed according to, and in conformity with the common law of England, and the forms of indictment, divested however of unnecessary prolixity, the method of trial, the rules of evidence, and all other proceedings whatsoever, in the prosecution of the said crimes, offences and misdemeanors, *changing what ought to be changed,* shall be, except as is by this act otherwise provided for, according to the said common law. In the case of *The State* v. *McCoy and others, ante* p. 545, this court declared, that the Legislature, in adopting the common law rules of proceeding, method of trial, &c., adopted the system as it existed in 1805, modified, explained and perfected by statutory enactments, so far as those enactments are not found inconsistent with the peculiar

character and genius of our government and institutions. The common law of England thus purified, modified and pruned, I understand as the law of Louisiana. I am aware that Judge Martin, in the case of *The Territory* v. *Nugent*, 1 Mart. 173, in commenting upon the act of 1805, asks: "How shall I ascertain what is *unnecessary prolixity* ? If I open the records which have hitherto been decided, I find that what the prosecutor for the Territory calls an *unnecessary prolixity*, has been held by wise judges an essential averment, the absence of which vitiates the indictment." No doubt he did find it so, and for that very reason, and for no other, did the Legislature pass the act of 1805. Trammelled by old forms and musty authorities, we know it was a constant source of regret with the English judges, that they were not clothed with authority to disregard and repudiate them, as no longer adapted to the improved and improving mind of the age and country. *Sic lex scripta est*, was the stubborn and unbending rule to which all their decisions were compelled to conform'; in consequence whereof they were obliged to resort to legal fictions and technical absurdities, for the purpose of avoiding the direct application of most of its requisitions ; many of which have now become obsolete, and have quietly sunk into desuetude, by general acquiescence rather than legislative enactment. To aver that in Louisiana crimes are prosecuted according to the common law of England, is not strictly and critically true. Neither is the refusal of Judge Martin to obey the law, because in similar cases the judges in England and in the United States have not deemed themselves warranted to pass judgment, a good reason for such refusal. He is not borne out by the fact ; for never were the judges in England nor in the United States, called on to pass or refuse to pass judgment in any similar case. No such statute as that of 1805 exists either in England or any of our sister States, so that no judge has ever (to my knowledge,) deemed himself unwarranted to *pass judgment in any similar case.* The refusal of Judge Martin to carry out the law, may be, and no doubt is, an evidence of his modesty, but the reason for the refusal is by no means satisfactory to me. If the Legislature had intended that their courts should only reject what an English court would have considered as unnecessary prolixity, and to preserve inviolate all that these courts considered *essential averments*, there would have been no necessity for the act of 1805 ; their courts would have been bound to do so without such an act. It could never have been contemplated, that the changes to be made, and the prolixities to be avoided, were those changes and that prolixity which would have been made or avoided in an English court. Can it, for an instant, be supposed, that the Legislature in pass-

ing this act, had in view only such changes as are enumerated in the judgment of the court, such as " not having the fear of God before his eyes,"—"Middlesex, ss : the jurors for our Lord the King," &c.   It is paying but an indifferent compliment to either the Legislature or the judiciary, to suppose so.   These changes the English judges would not have hesitated to make, without the sanction of any law upon the subject; such changes they *have* always made, and are now making.   Instead of the phraseology of the indictment in England, being, at this time " the jurors for our Lord the King," they have wisely substituted " the jurors for our Lady the Queen," or some such *formula*.   This description if changed, a change required to make it conform to truth, *mutatis mutandis*, would have been made by all our courts *without* any legislative enactment.   The act of 1805, therefore, to me seems intended to apply to a different state of things, and was passed for a different purpose.   Great power is no doubt conferred upon *the judges, to be exercised with the greatest caution,* and not to be resorted to under vain and frivolous pretexts, nor upon *all* occasions; but it was a power which *was necessary to* be lodged *somewhere.*   The idea that the Legislature could travel through the whole body of the common law, repudiating here, pruning there, re-enacting this provision and repealing that, is too preposterous to be entertained for a moment.   The task was too Herculean ; in fact, it was morally and physically impossible; and yet it was important and absolutely essential that this selection *should* be made, and the law winnowed from the trash and crudities, with which it was originally and in early ages incorporated.   To what body of men then could this august mission have been more safely entrusted than to that of the judiciary, chosen for their supposed erudition and moral worth, and trained by education and practice to the investigation of such matters ?   To me it seems that this was not only the *proper* but the *best* course to adopt.

This court, and in fact, every court in the State having criminal jurisdiction, have exercised the right conferred by the act of 1805.   Does the common law of England authorize new trials in capital cases ?   Does it justify that liberality of construction, and in many cases, that return to common sense, which every day characterizes their decisions ?   Did ever any one hear of an appeal having been taken by the Crown in a criminal case of any description ?   Yet these things are done, and rightfully, and legally done in our courts, changing what ought to be changed, by virtue of the act of 1805.   This must be so or else we must take the common law, as we find it, for better, for worse, with all its imperfections and absurdities ; and, instead of the judges being seated here, gravely examining questions of law, by recourse

to *books* and authorities, the lists should be opened, and the trial by wager of battle substituted in its stead. The test by the corsned, and the convincing evidence of innocence furnished by the power of walking unscathed and unburned, over red hot ploughshares, would be substituted for their present and humane representative, the trial as now known and practised under our law. We must come to this, or my reasoning on the law is right. These features of the common law have never been altered by the Legislature, which adopted it as the law of Louisiana in criminal matters, and according to the opinion of the court, just read, can not be changed or rejected by the judiciary.

I have succinctly endeavored to show, first, that if submitted to the test of the ordinarily accepted signification of the words— their grammatical construction,—the manner in which they would be understood in common parlance—the result would be invariably the same : viz., that the blow was given in the city of New Orleans, parish of Orleans, on the 29th of December, 1844, and that the death happened at the same time and in the same place. The sentence in the indictment descriptive of the offence is a very long one, and to give effect to it, so as to convey the charge, as understood by the court, the copulative conjunction *and* must be enlisted in the service, and made to fill the same office to connect the sentence, which is denied to it, when sought to be applied to eke out the words *then* and *there* (*tunc et ibidem*) which are I think necessarily understood and implied by the rules of grammar, and thus removing every vestige of doubt as to the meaning of the words. This being the only natural meaning of the words, about which no two men, in the ordinary transactions of life, could entertain a doubt, let us see whether there be any thing arising from technicalities of the law, which would give to them a different meaning. That arbitrary rule of the common law, which gives to the *same* words different meanings when applied in cases of felonies, from the meaning they would convey in a case of misdemeanor *only*, may possess many recommendations to the eye of the felon, though to him convicted of the minor offence, the distinction so unfavorable to his case could scarcely command his assent or approval.

To one not seeking objections, not anxious to detect flaws where none exist, even in a *technical* point of view, it seems to me, this indictment is clear and explicit. It avers in the ordinary phraseology of the law, that the blow was inflicted in the city of New Orleans, and parish of Orleans, on the 29th December, 1844, (with all the precision required,) and that a few hours after he died. The smallest subdivision of time known to the law is called a *day ;* no fractions of a day are noticed, according

to the maxim, *de minimis non curat lex ;* that the major includes
the minor is a postulate which the law easily recognizes and
adopts ; but, *vice versa,* the minor can never include the major.
Not losing sight of either of these propositions, is it not demon-
strated, beyond the reach of cavil, that when it is alleged that the
blow was given on the 29th. December, and that a few hours
after, the party died, that in the strictness of even technical pre-
cision, he must have died on the 29th, and not on any other day ?
Had it been intended to aver that he died on the next day, it
would have said so—*that is, that he died on the next day,* or that
he died on the 30th ; but having alleged that the wound was
inflicted on the 29th, and that he died after a few hours, it admits
of no other meaning than that he died on the 29th.   To declare
that a particular fact happened on a given day of the month, and
that, a few hours after, some other fact transpired, tested by any
rule which may be adopted, must be understood as circumscri-
bing the two events within the limit of the same day.   So when
we say a few minutes after twelve o'clock, we never under any
circumstances intend to extend the time to one o'clock, nor would
any one so understand us.   Add to this the concluding words
of the indictment, and to me, it seems impossible that any doubt
should remain : "And so the grand jurors aforesaid, upon their
oath aforesaid, do say, that the said Samuel Kennedy, the said
Benjamin Wood Wait, *on the day* aforesaid, *at the time* and *place*
aforesaid, and in the *manner* and form aforesaid, feloniously,
wilfully, and of his malice aforethought, did kill and murder," &c.
The *time* aforesaid was the 29th *December,* 1844, (the *only* time
mentioned ;) the *place* aforesaid was, the city of New Orleans,
parish of Orleans, the *only place* mentioned ; and the manner
aforesaid, by stabbing him with a knife, the *only manner* men-
tioned.   All this is strictly in conformity to the truth.   This ex-
plains any latent ambiguity which might be found in the obnox-
ious sentence.  *Id certum est, quod certum reddi potest.*   I readi-
ly concede, that to aver that the stroke took place on *two* days, as
on the first and second of May, or on an impossible day would
be fatal ; because being impossible it can never be reconciled, nor
can truth be converted into falsehood.   But my exposition makes
it *conform* to truth in every particular.

For these reasons I am of opinion that the judgment of the
inferior court should be confirmed.

## Application for a Re-hearing.

*Preston*, Attorney General, for a re-hearing. It is admitted, because the authorities are unanimous on that point, that if a material fact in an indictment be alleged with a certain day and place, the time and place of every other material fact which occurred on the same day, and at the same place, may be alleged, by referring by the adverbs *then* and *there*, to the time and place previously stated. It is admitted that it is stated in this indictment, with technical certainty, that Kennedy gave Wait a mortal stroke on the 29th day of December, 1844, in the parish of Orleans. Now the question is, whether the death of Wait, is referred by the adverbs *then* and *there*, in the indictment, to the said *time* and *place*, with technical certainty.

The indictment states, that Kennedy gave Wait a mortal stab, in the parish of Orleans, on the 29th of December, 1844, of which mortal stab he *then* and *there* suffered, languished, lived, and a few hours thereafter died.

All grammarians will agree, that the death is referred, in the foregoing sentence, by *then* and *there*, to the parish of Orleans, and the 29th of December, 1844.

The words "a few hours thereafter," are inserted in the statement to show precisely the facts which occurred. They refer, by grammatical construction, and by their inherent meaning, to the mortal stroke. They do not refer to the fact that Wait suffered, languished and lived, because he could not die a few hours after he suffered, languished and lived, but must have died the instant he ceased to suffer, languish and live.

The words "a few hours thereafter died," referring, therefore, to the mortal stab, and qualifying the death, as certainly connect the death with the day of the mortal stab, as the repetition of the word *then* would have done.

As to place, it is the opinion of the court, the indictment should have read thus: "Of which mortal stab the said Wait *there* languished and lived, and a few hours thereafter *there* died." The repetition of the word *there* adds nothing to the precise certainty of the place of the death, and therefore, is merely unnecessary prolixity, forbidden by the act of 1805.

I cannot admit for a moment, that the judgment in this case would have been arrested at common law, even before the statute of George the 4th abolished all these miserable technicalities in England. Hale, and Kenyon, and Ellenborough, and Mansfield, and Chief Justice Eyre, never would have arrested this judg-

ment after what they are reported to have said at pages 139 and and 140 of Chitty's Criminal Law.

There are but two *decisions* that can be found which give any countenance to such technicalities. One reported in black letter Norman French, at pages 68–69, of Dyer, in the reign of Edward the sixth ; and Cotton's case, in the reign of Queen Elizabeth. In the margin of the former case, Leonard, and Coke's Institutes, are cited, later authorities to the contrary ; and Lord Hale in stating the decisions says, they were given *in favorem vitæ.*

In Cotton's case, the allegation was, that Cotton, on the day, and at the place, having an axe in his hand, struck Spencer, whereof she the same day and year died. Exception was taken to the indictment, and it was held ill, because the place was alleged where he had the weapon in his hand, but not where he struck, or she died.

But this case is entirely different from the one before the court. The time and place were not connected, as here, by the copulative conjunction "*and*," with the death ; but qualified the having an axe in his hand, and not the stroke with the axe.

I have not seen the decision, that the *then* and *there* cannot be connected with the death, by the copulative *and ;* but that they must succeed and not precede the *and.* If there be such a decision, it is contrary to grammatical rules, and to the common understanding.

It cannot be pretended, but that the whole of the consequences of the mortal stroke given to the deceased Wait, are referred by the technical words *then* and *there* to the time and place when and where the mortal stroke was given, according to the strict rules of grammatical construction. *Then* and *there* qualify the words immediately following them, and all words connected with them by the copulative *and.*

Chitty indeed states, that that conjunction is not sufficient in some cases, but cites no authorities in support of his assertion ; nor does he specify the cases in which it is insufficient. Pages 181, 220.

But if this indictment could have been arrested at common law, it cannot be by our courts. They are directed by the act of 1805, to change what ought to be changed in criminal proceedings. In England they have changed by statute the practice of arresting judgments on such frivolous pretexts. No one will pretend that such a practice ought not to be changed here. Judgment was arrested in but two instances on such a ground in England, and that two or three hundred years ago. We have no knowledge of those remote and obscure cases ; but we know, that the courts expressly say, that the technicalities were admitted *in favorem vitæ,* and were inadmissible where the punishment was not capital. And why admitted *in favorem vitæ ?* Because a new

trial *could not be granted,* and for no other reason. No doubt, therefore, the courts finding a man convicted, *but innocent,* sought the pretext for arresting judgment, *in favorem vitæ,* which the rules of law forbid in cases not capital.

Under the power to change what ought to be changed, this court established, in the case of Hornsby, that a new trial should be granted in capital cases. They *had no other authority* to grant that new trial, except the power to change what ought to be changed in the common law, which allowed no new trial in capital cases, and by the principles of which they were bound until changed.

The court in making this great change, abolished the whole reason on which the courts in England, two hundred years ago, allowed this frivolous technicality, in arrest of judgment, *in favorem vitæ ;* and by abolishing the whole reason for allowing it, abolished the technicality itself.

The court did not notice the argument, that the place of the death has become immaterial, by our law's authorizing the prosecution at the place where the mortal stroke was given; and that the time of the death was immaterial, if the whole record showed that the death occurred within a year and a day after the mortal stroke. Archbold, 385. I relied with great confidence on these points, for I cannot conceive how a most solemn proceeding can be set aside for mere arbitrary rules, without reason. *Cessante ratione, cessat et lex.*

JOHNSON J. The majority of the court who concurred in the decision rendered in this case, have considered the grounds urged by the attorney general for a re-hearing, without being brought to the conclusion that it ought to be granted. Time and place must be added to every material fact in an indictment. In an indictment for murder, the death must be laid on a day within a year and a day from the time at which the stroke is alleged to have been given. The time and place of the death of Wait became a material fact to be alleged in the indictment. It is immaterial that the time and place is not alleged strictly according to the truth, since, in that case, if the proof shows that the death was within the year and day, it is sufficient. But the indictment must allege the day of the mortal wound, and the day of the death, with certainty, and not leave it to be inferred by inductive reasoning. The indictment must, from an inspection, and by comparison of the date of the mortal wound with the date of the death, show that the death has occured within the limit of the year and a day. Thus, for instance, after averring the day of the mortal wound, continue ; "of which said mortal wound the said J. N., from the said 3d day of May, in the year aforesaid, until the 15th day of the said month, at the parish aforesaid, in the county aforesaid, did lan-

The State v. Kennedy.

guish, and languishing did live ; on which said 15th day of May, in the year aforesaid, at the parish aforesaid, in the county aforesaid, of the said mortal wound did die." This form leaves no room for doubt as to the two periods of the mortal wound and of the death. How is the matter stated in the indictment now in hand? After alleging that the mortal blow was given on the 29th of December, 1844, it continues; "of which mortal wound so given by the said Samuel Kennedy, with the deadly weapon aforesaid, the said Benjamin Wood Wait did then and there suffer and languish, and languishing did live; and a few hours afterwards did die of the said mortal wound." How, we ask, is it proved on inspection of the indictment, by a comparison of the day of the mortal wound with the above account of the time of of the death, that the wound and the death both occured on the 29th of December, 1844? It is much easier to prove by process of reasoning, that it occurred on the 30th of December. For if the wound was inflicted on the 29th, and Wait then and there, (that is, at the parish of Orleans, on the 29th of December,) did languishingly live, and a few hours after, (that is to say, a few hours after the 29th of December,) did die of the said mortal wound, it would seem that he did not die on the 29th, but on the 30th. But in this respect, the indictment must prove itself; and the maxim "that is certain which may be rendered certain," has no force here.

We have already said, that we can take nothing to our aid in this instance, from the act of 1835, introductory of the common law. If we could, it would turn out an universal panacea for all defects in indictments, till at length it would be said, that an indictment needs no particular form. But the attorney general thinks that, in granting Hornsby a new trial, we must have drawn on that statute for the power. We were not aware of it, supposing that our right to grant a new trial, when justice and humanity required it, depended upon the act of the Legislature organizing this court, as well as upon the practice in our courts.

*Re-hearing refused.*