MONROE, J.
Defendant has appealed from a conviction of murder and sentence therefor, and presents his case to this court by means of 12 hills of exception and an assignment of errors.
Bill 1 was taken to the refusal of the court to grant a motion and application, which reads:
“On motion, Henriques & Dunn, attorneys for the defendant herein, make this their application for an order to issue by this honorable court on the jury commissioners of the parish of Orleans that the said Henriques & Dunn be permitted to examine the books and records of said jury commissioners.”
The reasons assigned by the court for refusing the application are thus stated:
“The above motion does not state what facts are intended to be established by the examination of the books and records of the jury commissioners, and the court cannot give an order so sweeping in its effects as would permit an inquiry into an office, the usefulness of which depends to a large extent upon its secrecy, without any specification having been made as to the purpose of the examination. If the law has been complied with, there must be in the wheel at present one thousand names of persons qualified to serve as jurors, which names, in the course of time, will have to be drawn for jury service. The administration of justice demands that these names shall not be disclosed until drawn *943 for jury service, unless there shall arise an imperative demand that they should. Whatever Information may be necessary for the trial of the above case can be obtained otherwise. Under the above motion, the court does not think that the order should be granted, and it is refused.”
Counsel for defendant invoke the authority of the law which requires the jury commissioners to select the names of no less than a thousand persons competent for jury service, and of the particular provision (in section 2, Act No. 170, p. 212, of 1894) which reads:
“A list of those names shall be prepared, certified to by the commissioners, and kept as part of the records of their office, subject to the order of the judge of the criminal district court of said parish.”
We find nothing in this law which deprives the judges mentioned of all discretion in the matter of making orders concerning the list in question, or from which it can be inferred that the “books and records” of the commissioners shall be open to the inspection of members of the bar or others, who, without assigning any reason therefor, may demand it. The reasons given by the trial judge for refusing to comply with the demand in the present case are conclusive, and his ruling is affirmed.
Bill 2 was taken to the overruling of a challenge to the array of petit jurors, as follows, to wit: (1) That the jury wheel did not, at the time the jurors required for service were drawn, contain 1,000 names of persons selected at large and impartially by the jury commissioners from the citizens of New Orleans; (2) that the drawing was not by the proper officers, in that the criminal sheriff was absent; (3 and 7) that the drawing was illegal, for the further reason that it was not made 12 days before the expiration of the December session of the court, (4 and 5) and because unauthorized persons were present and assisted therein; (6) that the panel was composed of 69 jurors, instead of 75, as required by law; (8) that the statute (No. 170, p. 211, of 1894) under which the drawing was made is unconstitutional, in that it vests the commissioners with judicial power, i. e., the power to determine as to who are and who are not persons of good moral character.
1. It appears from the evidence taken on the issue thus presented that, upon October 20, 1903, the wheel from which the names of all jurors required for service in the parish of Orleans are drawn was emptied by order of the judges of the criminal district court, and that upon the same day the names of 1,041 persons, whom for the present we assume to have been competent to serve as jurors, were placed therein. Subsequently names were drawn from the wheel and others were put in, until on December 22d there were 1,087 or 1,089 names in the wheel, from which number the jurors were drawn to constitute the January panel in Section B of the criminal district court, in which section the defendant was to be, and was, tried. Of the names put in the wheel between the dates mentioned, 165 • put in on November 5th, and 333 put in on November 24th, were names which had shortly before been drawn, but the bearers of which had not served, either because they had been excused by the courts, had been returned by the sheriff “out of the city” or “not found,” had not answered to their names when called, or, being tales jurors, had not been accepted or needed, or for some other reason; and, deducting their names, the number in the wheel on December 22d would have been reduced below that required by law. There is nothing in law, however, from which it can be inferred that a person otherwise competent becomes disqualified from serving as a juror because, his name having been drawn, he fails or is unable, for one reason or another, to serve at the time he is assigned to duty, and there is no reason, nor is the contrary suggested, why his name should not at once be returned to the wheel. But the law re *945 ■quires the commissioners to prepare and keep a list which shall “be a correct and perfect record of the names in the jury wheel” (Act No. 170, p. 212, of 1894, § 2), and this necessarily means that they must keep an account of the names drawn out, as well as of those put in, 'from which, it follows that, when names are checked off or stricken from the list as having been drawn out, and are thereafter returned to the wheel, they should either be relisted, or in some way restored to the original list, since it would otherwise very soon appear on the face of the record that more names had been drawn out of the wheel than had been put in, and the list which the commissioners are required to keep would cease to be “a correct and perfect record of the names in the jury wheel,” a result likely to bring discredit upon proceedings which it is of the highest importance should be above suspicion.
In this instance the commissioners did not relist the names returned to the wheel, but, in the absence of any evidence to the contrary, we must assume that they complied with the law requiring them to keep a “perfect record,” etc., by correcting the original list. In dealing with a similar condition arising under the act of 1880 (page 124, No. 98), this court, in referring to the apparent discrepancy resulting from the failure of the commissioners either to relist names returned to the wheel or to correct their original list, said:
“That discrepancy was explained by showing, as stated, that the names of drawn jurors who had not been found or who had otherwise failed to serve had been placed back in the wheel, and that their names had not been re-listed, for the reason that such names had been ■entered on some previous list. This is certainly an irregularity, and its inevitable result was the discrepancy between the number of juroz-s •drawn and the various lists in the hands of the clerk [the latter being then the custodian of the lists]. It is tile clear and unequivocal intent of the law that those two statements must tally, and hence the names of drawn jurors which are replaced in the wheel by the commissioners should be included in the new and supplemental lists as often as they are replaced in the wheel. But the point presented, beyond that discovery, shows no consequence that could invalidate the trial of the accused. It is not every irregularity which operates injury. The defendant has failed to allege, and a fortiori to prove, that the irregularity which he has shown vyas the result of any fraud, and was such a great wrong as would or did- work him an irz'eparable injury. This was an indispensable requirement, under the provisions of section 10 of Act No. 44, p. 58, of 1877. State v. Smith, 33 La. Ann. 1414; State v. Harris, 34 La. Ann. 118; State v. Rector, 35 La. Ann. 1098. Our only object in giving so much time to the discussion of this point is to secure a precise compliance with all the requirements of the law in the administration of justice in criminal cases. State v. Egan, 37 La. Ann. 369.”
The conclusion thus reached, is applicable in the instant case, the only difference between the two cases being that the defendant now before the court has alleged that the course pursued by the commissioners with respect to the matters complained of was a fraud upon his right and would cause him irreparable injury, but he has made no effort to sustain his allegations by proof, and we are satisfied from the evidence before us that no fraud was intended and no actual injury sustained. Concluding upon this point, we find it extraordinary that after the admonition contained in the foregoing excerpt the commissioners should have continued, or have returned to, the practice which was thus made the subject of criticism.
2. It is true that the criminal sheriff was absent when the names of the jurors required for the January session of Section B of the court were drawn from the wheel, but as his participation in the drawing is a ministerial function, and as the law does not require that he shall be present in person, he was properly represented by his chief deputy. A. & E. Ency. of Law (2d Ed.) vol. 9, p. 370; Willingham v. State, 21 Ela. 761; Const. art. 142; Rev. St. 1876, § 3541. There is therefore no merit in the objection that the sheriff was absent upon the occasion of the drawing in question.
*947 3 and 7. The law reads:
“Twelve days before the expiration of the monthly session of the criminal district court, the said commissioners, together with the said sheriff, shall draw from the said wheel, the number of names, not less than seventy five, ordered by either of the judges ♦ • *, and the persons whose names shall be so drawn shall constitute the petit jury for the session succeeding such drawing, except in cases where it may be necessary to select a grand jury,” etc.
In the instant ease, the judge of Section B, on the 17th of December, entered an order directing the commissioners, “together with the criminal sheriff, to proceed, on Tuesday, December 22d, to draw the names of 175 persons to serve as petit jurors in said court during the regular, January, 1904, term,” and further directing that the persons whose names should be so drawn be summoned to appear in court on Monday, January 4, 1904, and the order so made was obeyed. The monthly terms or sessions of the court, as established by rule, run “from the first Monday of one month to the empanelment of the new jury on the first Monday of the following month.” It is said, however, that, inasmuch as the court adjourned without day on December 23d, the then current session ended at that time, and hence that there were not 12 days between the drawing of the panel and the end of the session. There is no merit in this contention. The law, in fixing the delay which shall ensue after the drawing of the panel by reference to the “session” of the court, contemplates the session as fixed by law or by the rules of court, and not the uncertain contingency of a termination of the sittings of the court by adjournment for the Christmas holidays, for lack of business, or for accidental causes.
4 and 5. It appears that the criers or deputy sheriffs who serve in the two sections of the criminal district court were present at the drawing in question, but it also appears that neither they nor any other unauthorized person participated therein. As the com■missioners are not required to make their drawing in secret, this objection was properly overruled.
6 and 7. The commissioners, as ordered, drew- the names of 174 persons for Section B, of whom 157 reported for duty, and of that number 71 were impaneled, the others, “for good and sufficient reason,” having been excused by the court.
The learned counsel for defendant say:
“The imperative mandate of the statute is-that from the -whole venire returned into court after the selection of the grand juryt where a grand jury is to be selected, the remaining persons shall compose the petit jurors' for the-month. No exceptions are granted by the statute. Its terms are mandatory, and under all’ the safeguards provided for the drawing and impaneling of a jury; the contemplation of the law being that every name that goes into the jury wheel shall be a qualified juror when drawn for service, [and] unless death or sickness intervenes [shall] be liable to jury service.”
The position of the learned counsel is not sustained by the record, even though their premises shouid be conceded, since we are informed only that the jurors were excused “for good and sufficient cause,” and, for aught we know, that may mean “death or sickness.” But if death and sickness are sufficient to authorize the judge to excuse a juror, why may not flood, or famine, or some other cause furnish the same authority, since all are equally outside the statute-itself. We think the construction contended for inadmissible, because, among other-reasons, it would deprive the judges of the criminal district court of a necessary discretion in the matter of holding or excusing jurors, and would confer no benefit upon any one.
8. The qualifications of a juror, as required by the law which is here brought in question, are:
“To be a male citizen of the United States and of this state, and a resident of this parish for one year next preceding such service, not under interdiction, nor convicted of any crime punishable at hard labor in the state penitentiary. He shall be an intelligent person, of good moral habits and reputation, having the capacity and competency to serve as a grand juror.”
*949 It is made the duty of the commissioners to attempt to supply the courts with persons answering this description, but their conclusions upon the subject are binding upon no one, since it is further provided that “nothing in this act shall be so construed as to deprive the judges of the several courts of the right to decide upon their [the jurors’] competency” (Act No. 170, p. 211, of 1894), thus leaving to any individual who may feel himself aggrieved by the action of the commissioners all thq means of vindication and redress which he would have if no such commissioners existed. The power vested in the commissioners is therefore no more judicial power than is the power vested in the sheriff, who in most jurisdictions may be instructed to bring in competent tales jurors, and not idiots, drunken men, or vagabonds. The learned counsel argue that the testimony taken in support of their challenge developed certain irregularities, not specially referred to in their pleadings, which affect with illegality the panel presented to the court; as, for instance, that the oath re-, quired was not always administered in qualifying the jurors, and that some jurors were qualified (or attempted to be qualified) by a single commissioner, out of the presence of the others. We do not find the argument sufficiently sustained by the fact. Sixty-six of the jurors constituting the panel in question were examined as witnesses, and a careful consideration of their testimony leads to the conclusion that possibly, in three instances, by oversight or accident, the oath required was not administered by the commissioners. This omission could, however, have resulted in no injury to the accused, who was not called on to accept the jurors, and is not shown to have wasted any challenges on them. It is well understood that the function of examining prospective jurors was assigned to the jury commissioners merely to relieve the courts of having to appear before them great numbers of persons, many of whom, after much consumption of time, would be found to be exempt or incompetent; but the fact that jurors, as now presented to the courts, have previously been examined by the commissioners, in no manner affects the right of either party to a litigation, criminal or civil, to interrogate them on their voir dire, and, as before, to accept or reject them, as was done before the board of jury commissioners was established.
Complaint is also made that some of the jurors had been examined several months before their names were put in the wheel, the fact being that the commissioners sometimes examined more persons than were immediately necessary for jury service, and thereby accumulated a small reserve upon which they drew as occasion required. We find nothing in the law to justify us in holding that such a course is illegal, and, as it is not suggested that either of the (eight) jurors on the January panel in Section B of the criminal district court who are said to have been so obtained were incompetent or in any way disqualified, the complaint has no just foundation.
Bill 8 was taken to the overruling of an objection to the testimony, taken on preliminary examination, of one Cahn, a state witness, of whom it was shown that, according to his statement, his home is in New York; that he had sojourned in New Orleans for a' short while some three years before the homicide, and, having gone away, had returned and had been in the city during the two or three months immediately preceding, and for a week or two after, that occurrence, during which time he moved about from one boarding house to another; that he had stated that he would not be here to testify in this case unless there was something to be made by it, or words to that effect; that he owed money here, and went away without paying it, and was last heard from whilst at Corsicana, in Texas, and did not then intimate that he intended to return to Louisiana; and *951 -that diligent but unsuccessful search was made for him in Now Orleans for the purposes of the trial, but that his whereabouts could not be ascertained. The counsel for ■defendant abandon this bill, and it need only be said that the testimony was properly admitted, and that it is corroborated by that ■of the defendant, testifying as a witness in his own behalf.
Bill No. 4 was taken to the overruling of an ■objection to allowing a state witness to refresh his memory by reading the stenographic report of his own testimony given on the preliminary examination. The witness .appeared to be at fault in one particular whilst testifying on the trial, and, in reply to a question, stated that his memory was fresher when he previously testified than at that time, whereupon the court permitted him to read his testimony as previously giv■en, and, his memory being thereby refreshed, he testified from his recollection. The ruling was correct. “A witness may be allowed to refresh his memory respecting an issuable fact by any writing or other material thing offered in court for his inspection, if, after such inspection, the witness can testify to the fact.” Rice on Evidence, vol. 3, § 71, p. 108; Greenleaf on Ev. (16th Ed.) vol. 1, § 439, p. 549; Underbill on Cr. Ev. p. 269, note 2.
Bills 5 and 7 were taken to the overruling .of an objection to allowing state witnesses to examine certain clothing taken from the •defendant after his incarceration, with a view of identifying it as that worn by him .at the time of his arrest; the ground of the ■objection being that the clothing had been taken without the consent of the defendant, in violation of article 7 of the Constitution, .and that its use as evidence would be equivalent to compelling him to give testimony against himself in a criminal case, in violation of article 11 of the Constitution. It is shown that the clothing was somewhat con-:Sf>icuous in appearance, and supplied a means of identifying the defendant with respect to the time of the homicide and of his arrest a few moments afterwards. The objection was properly overruled.
“The clothing of the defendant may be exhibited to the jury to show that spots found thereon are blood stains, or for other purposes, though the article itself may have been procured from him without his knowledge of the purpose for which it was to be used. Incriminating articles may, if relevant, be used in evidence against the accused, though forcibly, irregularly, or illegally taken out of his possession.” Underhill on Ev. pp. 59, 60.
“It is also proper for the jury to see and investigate the clothing of the deceased, and its condition, as shedding light upon the manner and means of death, and so of the clothing of defendant, shown to have been worn by him at or about the time of the alleged commission of the homicide; and their production in evidence is not a violation of the constitutional provision that no person shall be compelled to give testimony criminating himself.” Kerr on Law of Homicides, p. 533.
See, also, Wharton's Cr. Ev. (9th Ed.) pp. 232, 233, 238; Rice on Cr. Ev. p. 108.
It may be remarked in this connection that the testimony given by the accused himself, as a witness in his own behalf, covered and corroborated all that appears to have been given by any other witness upon the subject of his identification, and hence that the contention here presented is rather academic than practical.
Bill No. 6. was taken to the overruling of an objection to the introduction in evidence of a pistol found near the scene of, and about 15 or 20 minutes after, the homicide; the ground of objection being that there was no evidence connecting the accused with the pistol, as having been in his possession or as having been owned by him, and, until such evidence was offered, the pistol could not be introduced in evidence against the accused. The judge ruled as follow's:
“I will allow the pistol to be offered in evidence, but I charge you, gentlemen of the jury, that, unless the pistol is connected by circumstances of some kind with the accused himself, the offer of this pistol is not to be considered by the jurors.”
The undisputed facts are that the accused and the deceased went together to a photo *953 graphic studio on the third floor of a building on Canal street; that, in leaving, the deceased preceded the accused down the first flight of steps, and was on his way down the second flight when he was killed; it being established by the evidence that he was shot four times, and that the firearm used was of “44 caliber.” It is undisputed that the accused immediately left the building, not by following the deceased down the second flight of steps, but by passing through a room on the second floor and stepping through a window, across a narrow alley, into an abutting house fronting on Rampart street, through which house he passed out into that street. About 15 or 20 minutes later a police officer and some others, in making an examination of the premises in which the homicide had taken place, found, in the 'room through which the accused had passed, the pistol in question, a 44-caliber pistol, with four chambers recently discharged. The pistol was not offered as having belonged to or as having been in the possession of the accused, and the jury were not only warned against so considering it, but against considering it at all, unless it should thereafter be connected with the accused.
Under the circumstances, however, it was not necessary to connect the pistol with the accused in order that it should be admissible in evidence. The finding of the pistol, and the pistol itself, taken in connection with the time and place of finding and its caliber and condition, were relevant evidentiary facts tending, as did the bullet taken from the body, to show the means by which the deceased came to his death. Wharton’s Cr. Ev. 311, 312, 766, 768; State v. Joseph McFarlain, 42 La. Ann. 803, 8 South. 600.
Bill 8 was taken to the overruling of the following testimony concerning the defendant given by a sergeant of police:
“I asked him his name; he told me Sam Aspara. I asked him how long he had known Mr. Luciano [Luciano being the deceased]. He said, ‘About two months.’ Then he began to tell me about this occurrence without me asking him anything more. He said on this morning Mr. Luciano had sent a boy to his house, asking him to come to his place of business, where-he wanted to see him. After reaching Mr. Luciano’s house, Mr. Luciano asked him to get in the wagon and accompany him to Canal street to get some pictures, and he and Mr. Luciano got into the wagon and went to Canal street; that after reaching Canal street they both got out of the wagon, and Mr. Luciano went upstairs into the photographer’s gallery, while he remained on the outside, in the wagon. Shortly after Mr. Luciano went upstairs, he heard some shots, but that he did not know who-did the shooting, and he was arrested in front of the wagon.”
The objections were, in substance, as follow:
(1) That, even if no direct promise was made or inducement held out, the surrounding circumstances were such as to create in the mind of the accused a fear or dread which would induce him to make a statement.
(2) That the alleged statement was not a confession at all, because it was not an admission of guilt on the part of the accused.
(3) That, if the testimony was offered for the purpose of contradicting that which the defense might offer, the state could not anticipate, for the purpose of contradicting, such testimony.
From the testimony brought up in connection with this bill it appears that the accused, when arrested, was taken to the station of which the witness, Sergt. Leroy, was in charge, and that he was placed in a cell; that the witness went to the cell, and, exhibiting a pistol, asked the accused whether it belonged to him, to which the accused answered that he knew nothing about it; that a little while afterwards the witness instructed the doorman to bring the accused into his, the witness’ office, which was done, and that thereupon the conversation in question took place. It further appears that the doorman said nothing' to the accused, save to put on his clothes and come down to the captain’s office, and that no one *955 at any time made any threats or held out any inducement to him; that the only persons present at the interview in the office were the sergeant, one officer, the doorman, and the clerk, the three first mentioned being in uniform; and that, when he made the statement the accused did not appear to be unduly excited, but “very cool.”
It is well settled that a confession, if free and voluntary, is admissible in evidence, even though made by one who at the time of making it was under arrest. State v. Jones, 47 La. Ann. 1524, 18 South. 515; State v. Lewis, 112 La. 872, 36 South. 788; Wharton’s Cr. Ev. (16th Ed.) 543. But the matter objected to was not a confession; it was an exculpatory statement (Wigmore, Or. Ev. vol. 1, § 821), and, as the state was in a position to prove that it was an attempt to lay the foundation for the establishment of a false alibi, it was admissible as tending to show consciousness of guilt coupled with a desire to escape punishment. Evidence of falsehood on the part of the accused in “giving an account of himself or of the transaction, or his relation to it, is competent as affording a legitimate presumption of guilt. For this purpose the prosecution may prove such declarations of the accused, and then prove their falsity.”
Abbott’s Trial Brief (Cr. Ev.) 457, 458; 1 Greenleaf (16th Ed.) § 195; Burrell on Circumstantial Evidence, 488; Wharton’s Cr. Ev. § 742; Underhill on Cr. Ev. § 116; Rex v. Miller (1895) Cox, Cr. Cas. vol. 18, p. 54; State v. Donelon et al., 45 La. Ann. 748, 12 South. 922 et seq. In the case of State v. Alexander, 109 La. 562, 33 South. 600, to which counsel for defendant refer, the court found that the statement there in question was not voluntary; that it was offered and used by the state as a confession; and that, in all probability, it had the effect of a confession, and thereby contributed to the conviction of the defendant, by whom it was made.
Counsel refer the court to certain rules, said to have been established by the board of police commissioners, regulating the duties of officers in charge of statiohs towards persons brought to such stations under arrest, but we do not find that they were offered in evidence or are contained in the transcript. They cannot, therefore, be considered. The objection presented by this bill was properly overruled.
Bill No. 9 was taken to the overruling of an objection to the testimony of a state witness to the effect that, whilst working in the same establishment with the accused some two or three months before the homicide, the latter came to work one morning and gave him (the witness) a bundle to put away for him, which he (the accused) said contained a 44-caliber pistol, wrapped, as the witness states, in what might have been a pair of trousers, and that witness put the bundle in a locker, from which it was subsequently taken by the accused; the objection being that the testimony was irrelevant. In signing this bill, the judge a quo makes the following statement, to wit:
“Per Curiam: The evidence showed that the accused [deceased] died of a wound inflicted by a 44-caliber pistol. The fact that the accused possessed such a pistol is a material fact in the chain of evidence, and is admissible. The objection went to the effect of the evidence. It was furthermore admissible to prove preparation.”
This ruling is manifestly correct, and needs no argument to sustain it.
Bill 11 presents a similar objection, which was correctly disposed of in the same way as that presented by bill 9.
Bill 10 was taken to the refusal of the judge to give certain special charges as requested by counsel for defendant, the reason for such refusal being that they were covered by the general charge. The requested charges are substantially as follows:
(1) That a criminal prosecution differs from a civil case in that in such prosecution a preponderance of evidence is insufficient; *957 in order to convict, the jury should he satisfied beyond a reasonable doubt of the guilt of the accused.
(2) That in a criminal case, if the evidence establishes a probability of guilt, but fails to establish guilt beyond a reasonable doubt, the accused should be acquitted.
(S)That, to warrant conviction, the defendant must be proved guilty so clearly and conclusively that there is no reasonable theory upon which he could be innocent, upon all the evidence in the ease considered together.
(4) That the jurors should found their verdict on the evidence alone, uninfluenced by any opinion not so founded.
(5) That if they found proved a single circumstance, constituting a necessary link “in the chain of the transaction,” inconsistent with the guilt of the accused, they should acquit him, no matter how suspicious other circumstances might be.
(6) That accused was entitled to every presumption of innocence compatible with the evidence, and that, if it were possible to account for the death of the deceased upon any other reasonable hypothesis than that of the guilt of the accused, they should acquit him.
(7) That every fact in the chain from which the defendant’s guilt has to be inferred must be proved “by the same weight, degree and force of evidence as if it were the main fact of the defendant’s guilt itself.”
These charges are fully covered by and included in the main charge, which is able, elaborate, and liberal to the accused, and which reads, in part, as follows, to wit:
“* * * The prisoner at the bar is presumed to be innocent until he is proven to be guilty. * * * He is not required to prove his innocence, but may rest upon the presumption in his favor until it is overthrown by positive, affirmative proof. The onus is therefore on the state to establish to your satisfaction, beyond any reasonable doubt, the guilt of the prisoner as to the crime charged in this indictment, or any other lesser one included in it. If you entertain any reasonable doubt as to any fact or element necessary to constitute the prisoner’s guilt, it is your sworn duty to give him the benefit of that doubt and return a verdict of acquittal. And even where the evidence demonstrates probability of guilt, yet if it does not establish it beyond reasonable doubt, you must acquit the prisoner. * * * You are prohibited by law and your oath from going beyond the evidence to seek for doubts upon which to acquit the prisoner, but you must confine yourselves strictly to a dispassionate consideration of the testimony given upon the trial. You must not have recourse to extraneous facts and circumstances in reaching your verdict. You are the exclusive judges of the facts. You find from the evidence what facts have been proven and what have not.
:K * * * * * it
“Circumstantial evidence is the evidence of certain facts from which are to be inferred the existence of other material facts bearing upon the question at issue or fact to be proved. This evidence is legal and competent, and, when of such a character as to exclude every reasonable doubt of defendant’s innocence, is entitled to as much weight as direct evidence. When a conviction is sought on circumstantial evidence alone, it must not only be shown by preponderance of evidence that the facts are true, but they must be such as are absolutely opposed, upon any reasonable ground of reasoning, with the innocence of the accused, and incapable of explanation upon any reasonable hypothesis other than that of the guilt of the accused. The degree of certainty must almost be equal to that of direct testimony, and, if there is any one single fact proved to your satisfaction by a preponderance of evidence which is inconsistent with defendant’s guilt, this is sufficient to raise a reasonable doubt, and the jury should acquit the defendant. * * * In order to justify the inference of legal guilt from circumstantial evidence, the proof must be absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of his guilt. * * * If there is any reasonable doubt as to reality of the connection of the circumstances of evidence with the facts to be proved, or as to the completeness of the proof of the corpus delicti, or as to the proper conclusion to be drawn from the evidence, it is safer to err in acquitting than in convicting.”
We find no reversible error in any of the rulings complained of.
It is therefore ordered, adjudged, and decreed that the verdict and sentence appealed from he affirmed.