(55 South. 582.)

No. 18,605.

STATE v. OTERI.

(May 8, 1911.  Rehearing Denied June 17, 1911.)

*(Syllabus by the Court.)*

1. CRIMINAL LAW (§ 413*) — EXCULPATORY STATEMENTS.

Exculpatory statements of the accused are not subject to the same rules which govern confessions or admissions of guilt.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 928–935; Dec. Dig. § 413.*]

2. HOMICIDE (§ 166*)—EVIDENCE.

Where the evidence tended to show that robbery was the motive of the homicide, it was competent for the state to prove that the deceased, the day before his death, was in possession of money and other valuables.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. § 329; Dec. Dig. § 166.*]

3. CRIMINAL LAW (§ 406*)—EVIDENCE.

Where the accused employed a notary to certify a pension voucher and to obtain an order for its payment from the proper United States authority, conversations between them relative to such subject-matter are admissible as explanatory of the acts of the parties.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 785, 894–927; Dec. Dig. § 406.*]

4. CRIMINAL LAW (§ 338*)—CIRCUMSTANTIAL EVIDENCE—RELEVANCY.

Where the state relies exclusively on circumstantial evidence, the objection of irrelevancy is without force, unless, after the close of the evidence for the prosecution, the accused requests the court to strike out the evidence objected to as irrelevant or to instruct the jury to disregard it, and the court refuses to do so.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 752–757, 787, 788, 801, 855; Dec. Dig. § 338.*]

5. CRIMINAL LAW (§ 855*)—TRIAL—MISCONDUCT OF JURORS.

Where, during the protracted trial of a murder case, a barber, with the previous permission of the court, attended by the sheriff, entered the jury room and shaved some of the jurors, and trimmed the hair of others, and then retired without speaking a word to any member of the jury, except saying "good-bye" as he walked out, *held*, that the facts affirmatively proved the absence of misconduct and prejudice.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2048–2053; Dec. Dig. § 855.*]

6. CRIMINAL LAW (§ 855*)—TRIAL—MISCONDUCT OF JURY.

Where the jury, with previous permission of the court, and under the charge of a deputy sheriff, attended a theatrical performance, sitting apart from the rest of the audience, and holding communication with no outsider while there or in coming and going, *held*, that the facts affirmatively established the absence of misconduct and prejudice.  The fact that a deputy sheriff was a witness for the prosecution does not disqualify him from serving as jury bailiff.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2048–2053; Dec. Dig. § 855.*]

7. CRIMINAL LAW (§ 1144*)—TRIAL—MISCONDUCT OF JURY.

Where there has been no separation of the jury, there is no presumption of misconduct, and it is for the court to determine on the evidence whether the alleged irregularities were of such a tendency as to influence their verdict.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3033; Dec. Dig. § 1144.*]

8. WITNESSES (§ 274*)—CHARACTER WITNESSES—CROSS-EXAMINATION.

A character witness for the accused may be asked on cross-examination as to whether he had ever heard that the accused had been arrested for, or charged with any crime or offense.  A verdict and sentence in a criminal case will not be reversed unless both error and prejudice are shown by the record.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 965–966; Dec. Dig. § 274.*]

9. CRIMINAL LAW (§ 829*)—SPECIAL INSTRUCTIONS.

Special instructions should not embrace propositions of law already substantially charged by the court, but should be restricted to particular omissions and errors in the general charge to which exception has been taken by the accused.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2011; Dec. Dig. § 829.*]

Appeal from Twenty-First Judicial District Court, Parish of Iberville; Calvin K. Schwing, Judge.

Frank Oteri was convicted of murder and appeals.  Affirmed.

Henriques & Otero, C. S. Hebert, and Schwing & Levy, for appellant.  Walter Guion, Atty. Gen., and J. H. Morrison, Dist. Atty. (G. A. Gondran, of counsel), for the State.

LAND, J. The accused was indicted for the murder of J. F. Stephens and was tried, found guilty as charged, and sentenced to be hanged.

The accused has appealed, and relies for reversal on a number of bills of exception.

The case against the accused was based entirely on circumstantial evidence. The accused and the deceased came from New Orleans to Plaquemines in a gasoline boat, owned by the deceased. After sojourning there for some two weeks, they left in the boat for Morgan City, some 80 miles down the Bayou Plaquemines. They left on the morning of September 14th, and on the following afternoon the accused returned alone to Plaquemines, where he was arrested by a deputy sheriff, who had received information by telephone that the body of Stephens had been found in Grand river, about 40 feet from the gasoline boat, which had been abandoned. Dr. Holloway, the coroner of the parish, viewed the body of Stephens, and found that his death had been caused by a fracture of the skull just over the ear, out of which his brains protruded. Dr. Holloway found in the boat a heavy piece of iron which fitted "very nicely" in the wound. On the trial Dr. Holloway so testified over the objections of the accused, who reserved a bill to the admission of the evidence. This bill is not discussed in the brief of the counsel, and is without merit. The testimony merely tended to show that the fatal wound was inflicted by the use of an iron bar found in the boat.

Bill No. 2 was reserved to the testimony of Dr. Holloway as to a certain conversation between the accused and Deputy Sheriff Erwin in the parish jail, relative to some articles of jewelry found on the person of the accused, on the ground that proper foundation had not been laid for proof of a confession or admission of guilt.

[1] The judge states:

"He made no confession of guilt, nor any such admission. The statement made at the time of his arrest was in explanation of his possession of some little articles of jewelry of small value."

An objection to a confession or admission of guilt on the ground that the state had not laid the proper predicate for the introduction of such evidence has no relevancy to exculpatory statements made by the accused. Dr. Holloway and the deputy sheriff testified that the statements made were absolutely free and voluntary, without threats or inducements of any kind. Dr. Holloway does state that a certain man said, "We ought to take him out and hang him," but swears that no threats were made at the time of the conversation between the accused and the deputy sheriff. It does not appear from the bill when the threat was made by the outsider. It has been often held that exculpatory statements of an accused are not subject to the same rules which govern confessions or admissions of guilt. State v. Howard, 127 La. 435, 53 South. 677; State v. Aspara, 113 La. 940, 37 South. 883; State v. Picton, 51 La. Ann. 625, 25 South. 375. It does not appear from the bill that there was any confession or admission of guilt by the accused. Bill No. 3 embraces the same ground of objection.

Bill No. 4 was reserved to the admissibility of the testimony of Jules A. Carville in behalf of the prosecution as to certain statements and acts of the deceased out of the presence of the accused. The said testimony may be summarized as follows: On Sunday, September 4th, a man walked up to Carville and introduced himself as J. S. Stephens, and asked if Carville was a notary, and could get pension papers for him. Carville replied he would if Stephens would come over to his office the next morning. On Monday Stephens called at Carville's of-

fice with the pension voucher, and Carville requested him to produce his pension certificate as provided by law. Stephens went to the boat in which the accused was sitting at the time, and in a short time returned with the pension certificate. Carville, after comparing the certificate with the voucher, filled the blank as notary, and mailed the voucher to the pension office at Detroit, Mich. The voucher was returned on the morning of September 13th, and Stephens came to Carville's office with the voucher and wanted to have it cashed. Carville told Stephens to step across to the bank. That is all that Carville knew of the transaction.

[2] The judge a quo says in his per curiam:

"The purpose of the evidence was to show that the deceased had money in his possession on the day before he left Plaquemine on a small gasoline boat, through the swamp, going towards Morgan City, accompanied solely by the accused. The objection aimed more at the weight and effect of the evidence than its admissibility. It could have had no effect had the state not shown circumstantially that the accused was in a position to know and did know of the affairs of the deceased, and that he was possessed of property of value."

The objection to the testimony was that it was not shown that the accused heard the conversations between Stephens and Carville, or knew that the deceased had drawn money from the bank. Carville testified that the accused was standing near by, when the first conversation took place, and was in the boat when Stephens went on board to get the certificate. The accused from his association with Stephens had the opportunity of knowing that he possessed money or valuable papers. The theory of the prosecution was that Stephens had been murdered and robbed by the accused, his fellow voyager. [3] It was certainly competent for the prosecution to prove that Stephens had in his possession a pension voucher on which money could have been obtained. The conversations between Carville and Stephens were explanatory of the transaction between them relative to the voucher. We see no error in the ruling of the court to the prejudice of the accused.

Bill No. 5 was reserved to the admission of a photograph. The judge states that it was shown that the photograph was that of the deceased.

Bill No. 6 was reserved to the admission of a tin box and contents found on the boat of the deceased the day after the homicide. The objections were that it had not been shown that there was any connection between said box and the accused, or that he knew of its contents, or that the contents were of some value. The judge states that it was shown that the box referred to was found on the gasoline boat, where the prosecution claimed the homicide was committed, a few hours after that boat had been abandoned by the accused and shortly after the homicide, and was in the same condition when offered in evidence as it was when found by the witness. The bill does not state what was the condition of the box when it, with its contents, was offered in evidence.

In the next bill, which is not referred to in the brief of the learned counsel for the accused, it is stated by the trial judge that a certain building and loan association statement, the property of the deceased, was found in a suit case belonging to the accused, and traced to his immediate possession.

In State v. McFarlain, 42 La. Ann. 805, 8 South. 601, where objection had been made to certain testimony as irrelevant to the issue, the court said:

"It is a fact to be taken into consideration that the state relied exclusively on circumstantial evidence, and was necessitated for that reason to make out proof of defendant's guilt by piecemeal, and to obtain it from any possible source at her command. At the particular stage of the proceedings at which these objections were interposed, it was in all likelihood

impossible for the judge to determine the pertinency of the evidence offered; and under the well-recognized rule of law that no party can be controlled in the order in which he shall introduce his testimony the only proper course for the judge was to admit the testimony under the reservation he made. And, had the grounds of defendant's objection been well taken, he should have insisted on the preferred instructions being given to the jury, and, the same having been refused, he should have reserved a bill of exceptions. We cannot perceive what other course was open to the judge; and, if the state failed to connect the proffered testimony with the crime charged, it would have been given no weight with the jury, and the defendant's counsel could have required the judge to so instruct the jury."

It is common practice in other jurisdictions to move the court to strike out irrelevant evidence when shown to be such. While no such reservation was made in the case at bar, the judge admitted the evidence because he deemed it relevant, and the onus is on the accused to show that the evidence objected to by him was not only irrelevant, but prejudicial. It is not shown that the state subsequently failed to connect the accused with the box and contents offered in evidence. The state was not required to prove this connection before offering the box in evidence. It may be readily imagined that the condition of the box and contents found on the boat a few hours after its abandonment by the accused had some relevancy to the question of his connection with the homicide. As already stated, the per curiam attached to bill No. 7 shows that evidence was adduced to prove that certain papers belonging to the deceased were found in the actual possession of the accused. We see no reversible error in bills Nos. 6 and 7.

[5] Bill No. 8 was taken to the refusal of the trial judge to discharge the jury because a barber was permitted to go with the sheriff under the instructions of the court into the room occupied by the jurors for the purpose of shaving and cutting the hair of some of them.

The sheriff testified that the barber while in the room plying his calling "never uttered a word while in there." The barber testified that he had no conversation with any of the jurors; that "he just shaved them and went out"; that he "just told them good bye," when he walked out. This incident happened before the case was submitted to the jury. The trial judge states:

"The jurors requested the court to permit a barber to serve them. It would have been cruel to have denied the request. There was no injury shown and could have been none."

There was no separation of the jury. The barber was there with permission of the court, and was all the time under the eye of the sheriff, who had the jury in charge.

The evidence directly negatives any presumption of prejudice to the accused as the result of the barber's presence in the jury room. While the mere presence of an outsider in the jury room may not suffice to set aside a verdict, where the absence of all prejudice is shown, nevertheless we must disapprove of such an irregularity as tending to afford a medium of communication between the jury and outsiders.

In State v. Kennedy, 8 Rob. 590, a murder case, the jury, after the adjournment of the court for the day, occupied the courtroom and clerk's office; the clerk and his deputy remaining in order to make up the record of the day's proceedings. The clerk when about to depart said to one of the jurors, "There take my cloak," and left the room; saying nothing more. A deputy clerk passed through the courtroom where the jury were supping, and was invited by several of them to join in the meal. He declined the invitation, but took a glass of wine, spoke a few moments with the sheriff, and withdrew without saying a word about the matter pending before the jury. The two deputy sheriffs in charge of the jury supped with them, but neither spoke to them nor permitted others to speak to them in relation to the trial. [7] The court said that

the presumption of misconduct does not arise where the jurors have been kept together, and the means thus provided for proving the precise nature and character of their irregularities, from which courts may determine whether the tendency of the acts has been to influence the verdict; and held that the few words exchanged by the jurors with persons not of their body were not of a character to produce the slightest effect upon the decision of the jury. The same court in State v. Hornsby, 8 Rob. 554, 41 Am. Dec. 305, had announced the doctrine that in capital cases where the jury have separated, misconduct, and abuse will always be presumed. Where the jury has not separated, as a general rule, a new trial will not be granted where it clearly appears that the defendant has not been injured or prejudiced by the misconduct. 12 Cyc. 717–720.

[8] Bills Nos. 9 and 10 were taken to questions propounded by the state on the cross-examination of two character witnesses of the defense. The objection was that they could only be cross-examined on matters brought out on their direct examination.

The cross-examination of the witness Micelli is in the record and was made part of the bill, and was in our opinion perfectly legitimate. The object of the cross-examination was to show that the character witness knew that the accused had been arrested or charged with stealing or embezzling a mule. The witness answered all the cross-questions in the negative. See State v. Le Blanc, 116 La. 824, 41 South. 105.

After the witness Mestier had testified to the good character of the accused, he was asked on cross-examination "if he knew when the defendant left New Orleans on this trip with the deceased Stephens," and "whether or not he knew anything about a mule or horse that had been rented to the accused, and whether he knew what had become of that horse, and whether the said witness knew whose property the horse was." The bill does not recite what answers, if any, the character witness gave to said questions.

The first question was admissible for the purpose of testing the knowledge of the witness, and the second was admissible as leading up to an inquiry that may have shown the knowledge of the witness as to some disreputable transaction in which the accused may have been involved.

Bill No. 10 shows that the other character witness was cross-examined as to his knowledge of a charge against the defendant for stealing or embezzling a mule. Besides, the bill does not state what answer, if any, was given to either question. Hence no prejudice to the accused appears on the face of the record. State v. Le Blanc, supra.

Bills Nos. 11 and 12 were taken to a certain part of the general charge of the court to the jury, and to the refusal of the judge to give certain requested special charges or instructions. The last bill is the first in logical order, as it is an exception to a part of the general charge, to wit:

"The state need not, however, prove that it is impossible for the crime to have been perpetuated by any other person than the accused, and that no one had an opportunity to commit it, or that it might possibly have been the act of some one else."

The judge states that:

"The jury was charged that it was necessary for the state to prove that the accused, and no one else, did kill and murder the deceased as alleged in the indictment. [See General Charge.]"

We make the following excerpts from the charge:

"In other words, the prosecution must prove beyond a reasonable doubt to your satisfaction that there were blows inflicted upon the deceased J. F. Stephens of sufficient violence to produce death; that such blows were inflicted before death and were the immediate cause of death; and that the defendant, Frank Oteri, delivered the blows that caused the death of Stephens, and that it is impossible upon any reasonable theory that any other person than Oteri could have delivered the blows which caused death. * * *

"And, in order to warrant a conviction on

circumstantial evidence, the circumstances taken together should be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion, and producing in effect a reasonable and moral certainty that the accused, and no one else, committed the offense charged in the indictment. * * *

"The presumption of innocence is always rebuttable. Evidence to conclusively rebut this presumption must be sufficient to convince a jury upon all the facts of the case beyond a reasonable doubt that the accused is guilty of the crime charged against him."

Here follows the paragraph to which the accused objected. Considering the context, the language used by the judge simply means that the state was not required to prove the guilt of the accused beyond the possibility of a doubt. A mere possible doubt is not a reasonable doubt. The charge as a whole was eminently fair to the accused, and was not objected to except in the particular mentioned.

[9] Without objecting to any other portions of the charge as insufficient or misleading, counsel for the accused requested seven additional sets of instructions which were refused because already covered by the general charge. These requested instructions, prepared in advance, contain a summary of the law applicable to cases of this kind. All have been waived except three, which contain merely general propositions of law. The charge as given, as far as we can perceive, states the essential propositions of law applicable to the facts of the case, so far as disclosed by the record, and the bills do not show in what particular the charge is defective or insufficient. No exception was taken to the charge except the one already considered.

The last bill was taken to the overruling of the motion of the accused for a new trial. One of the grounds assigned was that the jury was permitted to attend a theatrical show and sit with the audience during the performance. It appears that on a Sunday, during the recess of the court, the jury, attended by two deputy sheriffs, left their room in the courthouse to attend a theatrical show nearby.

After the jury were seated, one of the deputies retired, leaving the jury in charge of the other deputy, Mr. Erwin, who was a witness for the prosecution, and had testified several times during the trial of the case. The jury were seated on benches reserved for them, and the nearest spectators were about 10 feet away. The jury remained during the performance, and, according to the testimony of Mr. Erwin, had no communication with any one outside of their body. It appears that the jury had the permission of the judge to attend church or go to the show. The majority voted in favor of the place of amusement. It further appears that the judge had instructed the sheriff not to permit Deputy Erwin to handle the jury during the trial because he was an important witness for the prosecution. This instruction seems to have been ignored by the sheriff.

"Where a jury were allowed, by permission of the court, after being empaneled, to attend a theatrical exhibition in charge of a sworn officer, when they did not separate or communicate with any outside of their body, and it not appearing that the jury were thereby affected in the full and impartial discharge of their duties in trying the case and rendering a just and true verdict, *held*, no sufficient cause for setting the verdict aside." 17 Am. & Eng. Ency. of Law, p. 1202.

It has been held in a number of cases that:

"The fact that an officer is sworn and testified as a witness does not disqualify him from acting as bailiff in charge of the jury during their deliberations." 12 Cyc. 670.

As a matter of law, Mr. Erwin was not disqualified to act as bailiff because he happened to be a witness for the prosecution. In this state it is not customary to appoint a bailiff to take charge of the jury, but the sheriff or any of his deputies is considered as ex officio bailiff.

The evidence shows that the jury did not separate for a moment and had no communication with any one outside of their body.

Therefore the accused was not prejudiced by the incident under discussion. We, however, must express our disapproval of the permission given the jury to attend the show, thereby subjecting them to the danger of outside influence. We may add that our ruling would have been different if any prejudice whatever had been shown by the evidence.

The defenses in this case are purely technical. It does not appear from the record that the accused has been illegally convicted of the murder of his employer and associate.

It is therefore ordered that the verdict and sentence below be affirmed.